IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANTOINETTE WILSON O/B/O J.D., a Minor, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 13 C 8458 ) |
| CAROLYN COLVIN, Acting Commissioner of Social Security, | ) ) ) ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Antonette Wilson ("Wilson"),[1] on behalf of her daughter J.D., seeks judicial review pursuant to Social Security Act ("Act") § 405(g)[2] of the final decision of Commissioner of Social Security Carolyn Colvin ("Commissioner") denying J.D.'s claim for supplemental security income ("SSI") disability benefits. Both parties have moved for summary judgment under Fed. R. Civ. P. ("Rule") 56, and Wilson has alternatively moved to remand for further proceedings. For the reasons stated here, both Rule 56 motions are denied, but Wilson's alternative motion to remand is granted.

**Standard of Review and Applicable Law**

This Court reviews the ALJ's decision as Commissioner's final decision, reviewing the legal conclusions de novo and factual determinations with deference (<u>Haynes v. Barnhart</u>, 416

---

[1] Wilson's name is spelled both "Antoinette" and "Antonette" throughout the record. Because she appears to sign her name "Antonette," this opinion adopts that spelling.

[2] Further statutory references will take the form "Section --," using the Title 42 numbering rather than the Act's internal numbering. All 20 C.F.R. references are cited "Reg. § --." Lastly, Wilson's and Commissioner's memoranda are respectively cited "W. Mem. --" and "Comm. Mem. --," with Wilson's reply memorandum cited "W. R. Mem. --."

F.3d 621, 626 (7th Cir.2005)). Because factual determinations receive deferential review, courts may not "reweigh the evidence or substitute [their] own judgment for that of the ALJ" and will affirm Commissioner's decision "if it is supported by substantial evidence" (id.). But as Haynes further explains, "the ALJ must build a logical bridge from the evidence to his conclusion" (id.). Hence "[i]f the Commissioner's decision lacks adequate discussion of the issues, it will be remanded" (Villano v. Astrue, 556 F.3d 558, 562 (7th Cir.2009)).

To be found disabled, a child must meet or equal (either medically or functionally) the elements of an impairment listed in Appendix ("App'x") 1 to the Act's implementing regulations (see Reg. § 416.924). Those regulations create a multistep analysis for determining disability:

1. Commissioner must find that the child was not performing substantial gainful activity (Reg. § 416.924(b)).

2. Commissioner must then determine that the child has a severe medically determinable impairment or combination of impairments (Reg. § 416.924(c)).

3. With a "yes" answer at step 2, the next step is to determine whether the impairment meets or equals an impairment listed in App'x 1 (Reg. § 416.924(d)).

If all three steps have produced "yes" answers, that spells disability. But if the answer at step 3 is "no," Commissioner must then consider whether the child's limitations are functionally equal in severity to any listed impairment (Reg. § 416.924(d)) by analyzing the child's limitations in six domains of functioning: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for oneself and (6) health and physical well-being (Reg. § 416.926a(b)(1)).

Under that functional equivalence test, a child is disabled if she suffers from two "marked" limitations or one "extreme" limitation (Reg. § 416.926a(a)).

"Marked" limitations "interfere[ ] seriously" and "extreme" limitations "interfere[ ] very seriously" with the "ability to independently initiate, sustain, or complete activities" (Reg. §§ 416.926a(e)(2)(i), 926a(e)(3)(i)). More quantitatively, the regulations define those terms this way: Where standardized test results are available, performance "at least two" standard deviations below the mean implies a "marked" limitation, while performance "at least three standard deviations" below the mean implies an "extreme" limitation (id.). For children under age 3 such as J.D., if there are no standardized test scores available in the record, functioning at a level "not more than two-thirds" of her chronological age implies a "marked limitation," while functioning at a level "one-half of [her] chronological age or less" implies an "extreme" limitation (Reg. §§ 416.926a(e)(2)(ii), a(e)(3)(ii)).

**Procedural Background**

On November 18, 2010 Wilson filed an application for SSI disability benefits on behalf of her daughter J.D. (R. 115-23). That application was denied both initially and on reconsideration (R. 58, 63). Wilson then requested and received a hearing (the "Hearing"), which took place before Administrative Law Judge ("ALJ") Jose Anglada on March 26, 2012. Represented by counsel, Wilson testified during the hearing (R. 34-35). ALJ Anglada issued a decision denying SSI disability benefits on April 26, 2012 (R. 14). Although the ALJ concluded that J.D. did indeed have severe medical impairments -- developmental delay, left metatarsus adductus and asthma -- those impairments were held neither to have met nor to have equaled (medically or functionally) a listed impairment, so that J.D. was held not to be disabled (R. 20). That decision became Commissioner's once the Appeals Council denied Wilson's request for

review (R. 1).  On December 13, 2013 Wilson filed a timely complaint for judicial review (Compl. 1, ECF No. 8).

**Factual Background**

Wilson gave birth to J.D. prematurely (at 32 weeks old[3]) on November 22, 2009, weighing just 3-1/2 pounds (R. 218).  At the time of the hearing, J.D. was 2 years and 4 months old (see R. 17, 20).  Wilson's application for SSI disability benefits cited four health problems: asthma, a left foot metatarsus adductus,[4] acid reflux and developmental delay (R. 57).  But the crux of Wilson's appeal concerns J.D.'s developmental delay.  Wilson argues that after the agency's experts completed their review of the medical evidence in June 2011 (when J.D. was about 1-1/2 years old), new evidence came to light that indicated more severe developmental delays that the ALJ neither addressed in his opinion nor had reviewed by an expert (see W. Mem. 13-14).

**<u>Medical History</u>**

J.D.'s developmental issues first materialized as physical delays.  At the age of 6 months, tests revealed a 42% delay in motor development, for which J.D. began receiving physical therapy through Early Intervention Services (R. 218-21, 225).  By her second birthday, however,

---

[3] There are some discrepancies in the record as to precisely how prematurely J.D. was born (see, e.g., R. 374 noting discrepancy), but Wilson's motion used the 32 weeks figure (W. Mem. 2).

[4] Metatarsus adductus is a "foot deformity" wherein "[t]he bones in the middle of the foot bend in toward the body," "[t]he front of the foot is bent inward" (R. 236).  Treatment depends on the severity of the deformity -- for "most children" the problem corrects itself as they grow, while in others it requires stretching and, in rare instances, casting or surgery (<u>id.</u>).  J.D.'s condition required that she wear a brace (see, e.g., R. 359).

J.D. no longer needed physical therapy -- her gross motor skills had improved enough that she "could run, jump . . . and negotiate stairs [ ] like . . . any other child her age" (R. 524).

While her gross motor skills improved, other issues became more pronounced. In late 2010, when about 1 year old, J.D. began occupational therapy for sensory integration problems, sensory disorder and a lack of coordination (R. 281). Her occupational therapists noted a "definite difference" in J.D.'s sensory processing abilities, placing her "in the deficient range," at least two standard deviations away from average overall (or in the bottom 2-1/2 % of children her age) (R. 283, 285). In 2011 J.D. also commenced speech and behavioral therapy (R. 494-95).

That February consulting psychologist Mark Langgut ("Langgut") evaluated J.D. to determine SSI eligibility (R. 393). According to his evaluation[5] J.D. scored in the third percentile for her language abilities and in the ninth for cognitive abilities (R. 395). Langgut noted that J.D. "did not respond to her name," "had difficulty attending to tasks and required a great deal of focusing assistance from her mother" (id.). Overall he concluded that she was "quite far behind. . . in [her] . . . language [and] . . . cognitive development[ ]," although motor skills were in normal range (id.).

Reviewing physicians and psychologists assessed the evidence of record shortly after Langgut issued his report in the spring, and they reassessed the evidence again that summer (R. 397-402, 406-11). They concluded each time that J.D. was not disabled because, while she

---

[5] Langutt used the Bayley Scales of Infant Development, which measures the mental and motor development of young children. It "has become a gold standard for assessment of early childhood development" (William B. Carey et al., Developmental-Behavioral Pediatrics 789 (4th ed. 2009)).

had severe impairments, they did not meet or equal any listed impairment (R. 397, 406). On the functional equivalence analysis, they determined J.D. had less than marked limitations in every domain but self-care, where she had no limitation (R. 399-400, 408-09).

After the reviewing physicians and psychologists had completed their reports, new medical reports suggested some increased developmental delays (R. 412-551). Wilson submitted those at the hearing level, but no expert ever reviewed them.

Most central to J.D.'s appeal is the Children's Memorial Hospital Early Intervention Medical Diagnostic Evaluation Report (the "Children's Report"), prepared by a developmental pediatrician, nurse, occupational therapist and speech pathologist shortly after J.D. turned 2 (R. 510-20). Their report documents a 46% delay in language and a 34% delay in visual motor skills[6] on the Capute Scales, results that the report deemed "of good reliability" (R. 514). On the Rosetti Infant Toddler Language Scale, J.D. exhibited a 38% delay in receptive language abilities and a 50% delay in her expressive language abilities (R. 517). On the Vineland Social Emotional Early Childhood Scales, a parent-interview tool, J.D. exhibited a 50% delay in use of play and leisure time and a greater than 50% delay in interpersonal relationships (R. 514).

According to the Child Behavior Checklist that Wilson completed for the Children's Report, J.D. scored in the clinical level -- above the 97th percentile of all children -- for showing "Emotionally Reactive, Anxious/Depressed, Somatic Complaints, Withdrawn, Sleep Problems and Aggressive Behavior Syndromes" and "Affective Problems, Anxiety Problems, Pervasive Developmental Problems, and Oppositional Defiant Problems" (R. 515). Although the

---

[6] In January 11, 2012 a later assessment revealed a 36% delay using "standardized assessment tools" (R. 506).

Children's Report ruled out autism (R. 518), it suggested that the Diagnostic and Statistical Manual of Mental Disorders should be consulted to determine whether J.D. meets the criteria for "affective disorders, anxiety disorders, Pervasive Developmental Disorder, and Oppositional Defiant Disorder" (id.). Finally, in contrast to other findings that suggest J.D.'s motor skills were within normal ranges (see, e.g., R. 395), the report reflected a 46% delay in grasping (R. 516).

Just days after the Children's Report issued, treating physician Ruby Roy noted that J.D. "may have ADHD in the future, and is certainly at risk for it" (R. 437). She also noted a concern that J.D.'s behavior might be "exacerbated by" that of her mother, who had grown "frustrated" with her daughter's behavior (id.). In January 2012 another report completed for Early Intervention Services observed that although J.D. was "bright, alert, and exploratory," she exhibited a "high activity/arousal level" and had "difficulty . . . focusing on tasks, [was] unable to follow directives, and [wa]s constantly moving, running and climbing on things" (R. 505). While a number of reports from J.D.'s therapy appointments document good behavior during the visits (see, e.g., R. 530),[7] in one September 2011 therapy assessment J.D. "hit her mother, then hit the therapist and pushed her stroller into her mother's leg" in an apparent effort to obtain attention (R. 526). Wilson also reported that J.D. periodically tried to hurt herself when she was upset (R. 533).

**Testimony at the Hearing**

By the time of the hearing J.D. had attended therapy 3 times weekly for speech, occupational and behavioral problems, and her mother reported spending close to 20 hours working with her on her development (R. 46). Wilson said that J.D. would not dress herself, had

---

[7] In mid-June, for example, Social Worker Shelly Gore described J.D. as an "adorable little girl" who made "good eye contact" (R. 530).

not been potty trained and did not yet use silverware to eat (R. 42). In addition she exhibited no interest in other children, and she showed extreme sensitivity to loud noises and touch (R. 44, 53). Because each of Wilson, the pediatrician and J.D.'s teacher had noticed that J.D. did not always respond when others spoke to her, Wilson testified that she had taken her daughter to an ENT to determine whether her sensory issues were physical or mental/behavioral in nature (R. 49-50). As for J.D.'s speech, Wilson estimated that she understood about 30% of it and that others understood much less (R. 52). Because of J.D.'s various and growing problems, Wilson said J.D. was slated to receive increased Early Intervention Services (R. 53). As to J.D.'s physical problems, Wilson testified that J.D. wore a brace 24 hours a day and had been falling a lot, and she suggested that J.D. might need surgery (R. 51).

## ALJ's Decision

Although J.D. had severe medical impairments, ALJ Anglada held that she did not qualify for SSI disability benefits because her impairments did not (a) meet or medically equal a listed impairment or (b) functionally equal the listed impairments (R. 20). On the first of those holdings the ALJ simply stated that he "considered all of the listings," paying particular attention to the listings for asthma, organic mental disorder and autism/other pervasive developmental disorders, and he found the medical evidence inadequate with no further elaboration (id.). As to the second holding the ALJ applied the six-factor test and also concluded that J.D. suffered no functionally equivalent impairment (id.). Without discussing any of the quantitative test results (such as those contained in the Children's Report), the ALJ determined that J.D. had absolutely no limitation in acquiring and using information and less than marked limitations in every other domain (R. 23-30).

**Need for a Remand**

Wilson contends that summary judgment or, in the alternative, remand is warranted because (1) the ALJ's decision was not supported by substantial evidence and (2) the ALJ should have obtained an updated expert opinion that examined the new medical evidence (W. Mem. 8, 14). It is indeed an understatement to say that a remand is called for on both grounds.

**Lack of Substantive Supporting Evidence**

First, Wilson argues correctly (W. R. Mem. 1) that the ALJ did not discuss any evidence in announcing his conclusion that J.D.'s impairments did not meet or medically equal a listed impairment. That flat-out flouts this Circuit's earlier-quoted clear mandate that the ALJ "build a logical bridge from the evidence to his conclusion" (Haynes, 416 F.3d at 626). When Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded" (Steele v. Barnhart, 290 F.3d 936, 940 (7th Cir. 2002)). Here not even a minimal discussion accompanied the ALJ's ipse dixit, and that ground alone compels remand (see Kastner v. Astrue, 697 F.3d 642, 647 (7th Cir. 2012)).

That error would not of course warrant remand if it were harmless -- but it is not. Errors are harmless only if the Court is "satisfied that no reasonable trier of fact could have come to a different conclusion" (Sarchet v. Chater, 78 F.3d 305, 309 (7th Cir. 1996)). While the record may perhaps not be so clear that it can "yield but one supportable conclusion" in favor of disability (Campbell v. Shalala, 988 F.2d 741, 744 (7th Cir. 1993)), it clearly cannot be said that no reasonable trier of fact would reach that conclusion.

As Wilson argues, some of the evidence could well support a conclusion that J.D. actually meets the listing requirements for an organic mental disorder or for autism/pervasive developmental disorders or for both (W. Mem. 9). Each of those listings contains a two-pronged

- 9 -

test, parts A and B (App'x 1, Listings 112.02 and 112.10). Neither party disputes that J.D. satisfied the part A requirements for either listing (see W. Mem. 9, Comm. Mem. 6-8, W. R. Mem. 3). Instead they joust over whether J.D. could possibly meet part B (see W. Mem. 9-10, Comm. Mem. 6-8). That standard, identical in the two listings, requires a child to demonstrate a 50 % or more delay in (a) "[g]ross or fine motor development," (b) "cognitive/communicative function" or (c) "social function" (App'x 1, Listings 112.02(B)(1) and 112.10(B)), a delay that must be documented in "[a]n appropriate standardized test" or via "[o]ther medical findings" (id.). If the child does not have a single 50% delay, a one-third delay in any two of those areas suffices (App'x 1, Listings 112.02(B)(1)(d) and 112.10(B)).

Given the test results set out in the Children's Report, a reasonable trier of fact could surely have concluded that one or both of J.D.'s cognitive/communicative functioning and her social functioning was or were 50% delayed, or that she showed a one-third delay in both domains, so that she meets the listing requirements in either event. On that score there is no need to repeat this opinion's earlier <u>Medical</u> <u>History</u> recital.[8]

Commissioner contends, in violation of the principles announced in <u>S.E.C. v. Chenery Corp.</u>, 318 U.S. 80, 87-88 (1943), that J.D. cannot possibly meet part B because the test results do not reveal broad <u>categorical</u> delays in the areas of cognitive/communicative function or social function (Comm. Mem. 6-7). Thus for example Commissioner argues that a 50% expressive language delay does not equate to a 50% overall delay in cognitive/communicative function (<u>id.</u> at 7). But Commissioner cites no law in support of his contention that the regulation requires

---

[8] In all candor, the detailed recital earlier in this opinion has pointed strongly in the direction of a determination of disability -- but this Court is keenly aware that its role in the social security area is that of a reviewing court, not a nisi prius tribunal, and that calls for remand rather than outright reversal.

that a single test result demonstrate such an <u>overall</u> delay.  In any event, this Court declines to rule on the issue because of the difference between its role and that of an ALJ (that is, an ALJ who is really doing his or her job), as noted in n. 8.  What cannot be gainsaid is that this ALJ's failure to articulate his reasoning was not harmless error.

**<u>Functional Equivalent Analysis</u>**

All of that, however, is not the only shortfall in the ALJ's work product.  To enable "meaningful appellate review," an ALJ has an obligation to consider all relevant lines of evidence and to reconcile any material inconsistencies -- he or she may not "select and discuss only that evidence that favors his ultimate conclusion" (<u>Herron v. Shalala</u>, 19 F.3d 329, 333 (7th Cir 1994)). Because the ALJ cherry-picked the record to find that J.D. suffers no functionally equivalent impairment, his analysis on that score also lacks substantial evidentiary support.

Most notably, never once in his discussion of any of the six functional equivalence factors does the ALJ cite a single quantitative test result (see R. 20-30).  Despite his obligation to address evidence that cuts against his decision, ALJ Anglada did not touch on the quantifiable developmental delays detailed in the Children's Report or elsewhere in the record.  Yet, for example, the fact that tests given just a few months before the hearing revealed a 46% delay in J.D.'s language capabilities is relevant to many prongs of the functional equivalence analysis -- most obviously, to the ability to acquire and use information and the ability to interact with and relate to others.[9]  J.D.'s over 50% delay in interpersonal relationships is also clearly relevant to her ability to interact with and relate to others, but it too is conspicuously absent from the ALJ's analysis.

---

[9] Moreover, the fact that those test results showed a marked increase in the delay factor over earlier tests could also be viewed as significant.

Similarly, the ALJ did not reconcile the evidence about J.D.'s physical capabilities. Thus he concluded that J.D. had a less than marked limitation in her ability to move about and manipulate objects because she no longer needed physical therapy in 2011 (R. 27-28). Yet by the time of the hearing (some five months later) Wilson testified that J.D. had trouble walking about and implied that she might even need leg surgery (R. 51) -- and the ALJ did not even address that testimony. Moreover, the absence of a need for physical therapy speaks only to J.D.'s gross motor skill development, not to her fine motor skill development such as grasping small items (see Prathibha Varkey, Mayo Clinic Preventive Medicine and Public Health Board Review 122 (2010)). On that score the evidence is conflicting and deserved attention: For example, the Children's Report showed a 46% delay in J.D.'s grasping abilities (R. 516), while a report issued about 1-1/2 months earlier suggested only a 23% delay in grasping and fine motor skills (R. 538). Another report issued even earlier showed no delay in object manipulation (R. 541). There is no mention of those differing results (or of the possible significance of numbers that increased so substantially over time).

Wilson is also right in contending that the ALJ's analysis is further flawed because it focused on J.D.'s personal progress and did not compare her performance to that of others her age (see W. Mem. 11). SSR[10] 09-2P provides, "[w]hen we consider functioning in children, we evaluate how the impairment(s) affects the ability to function age-appropriately" -- not how well the child meets her own personal goals. Indeed, the fact that a child is receiving help or support -- such as speech therapy -- indicates a limitation "even if the child is functioning well

---

[10] That is the well-known acronym denoting Social Security Rulings.

with the help or support" (id.).  In fact, the more assistance a child receives "the less independent[ ]" she is "and the more severe . . . the limitation." (id.).

In light of the plain teaching of the SSR, which charts the path of an ALJ in his or her disability rulings, it is frankly astonishing that ALJ Anglada's analysis for many of the functional domains -- acquiring and using information, interacting with and relating to others, caring for oneself and overall health and well-being -- contains absolutely no discussion of how J.D. stacked up against her peers at the time of the hearing, nor does it take into account the fact that she was still undergoing therapy for her various limitations.  Instead, for example, he concluded that J.D. had no limitation in acquiring and using information simply because she had met "some of" her personal speech therapy goals and was "bright, alert, and exploratory" (R. 24).

Though it is hardly necessary to elaborate on the ALJ's deficiencies to support the need for remand, this Court has noted a troubling flaw that Wilson's counsel did not raise -- the ALJ's discrediting of Wilson's testimony that she could not understand her daughter's speech 70% of the time.  As the ALJ would have it, because J.D. had "improved and even met" some of her personal speech therapy goals, the mother must have understood more than 70% (R. 27).[11]  But the fact that J.D. met personal speech goals says nothing about how comprehensible her speech is to others.  To be sure, a reviewing court must respect credibility determinations unless "patently wrong" (Simila v. Astrue, 573 F.3d 503, 517 (7th Cir. 2009)), but a determination "based on errors of fact or logic" does not merit such respect (Allord v. Barnhart, 455 F.3d 818, 821 (7th Cir. 2006)).  Here too the ALJ flunks the test.

---

[11] In fact the ALJ actually misquoted Wilson as having claimed to understand only 10% of J.D.'s speech (R. 27)!!

In sum, the errors painstakingly (and painfully) detailed here cannot possibly be viewed as harmless. Remand is more than amply justified.

**<u>ALJ's Mishandling of the Medical Evidence Requirements</u>**

As if that were not enough (and it is), there is another (and independent) reason that calls for a remand. That defect lies in the ALJ's failure to have obtained an updated medical opinion.

Wilson makes two arguments on that score: first, that in the absence of an updated opinion the ALJ impermissibly found it necessary to "play doctor" (<u>Rohan v. Chater</u>, 98 F.3d 966, 970 (7th Cir. 1996)) and second, that the ALJ had an obligation pursuant to SSR 96-6P to obtain an updated medical opinion to determine medical equivalence. This Court's analysis supports the first of those contentions but not the second.

As to the first contention, <u>Rohan, id.</u>, teaches that ALJs "must not succumb to the temptation to play doctor and make their own medical findings," a teaching that such cases as <u>Blakes ex rel. Wolfe v. Barnhart</u>, 331 F.3d 565, 570 (7th Cir. 2003) reframe as precluding ALJs from substituting their own opinions to fill gaps in the record. While a claimant bears the burden of proving disability, the ALJ conducting a Social Security hearing has "a duty to develop a full and fair record" (<u>Nelms v. Astrue</u>, 553 F.3d 1093, 1098 (7th Cir. 2009)) and to "recognize the need for additional medical evaluations" where the evidence is insufficient (<u>Scott v. Astrue</u>, 647 F.3d 734, 741 (7th Cir. 2011)). That is particularly important in child disability cases because, as SSR 09-2P explains, children who have "significant but unexplained problems may have an impairment(s) that has not yet been diagnosed", so that "[a]djudicators should pursue indications" of an impairment that may be "material" (SSR 09-2P). Hence courts consistently hold that an ALJ's substitution of his own medical judgment, together with a disregard of

relevant medical evidence, warrants reversal (see, e.g., Dixon v. Massanari, 270 F.3d 1171, 1177-78 (7th Cir. 2001), collecting cases, as well as the later cases cited earlier in this opinion).

Here the ALJ relied on his own lay opinion at critical points in his decision and, as discussed above, ignored pertinent medical evidence. For example, the ALJ concluded, contrary to the reviewing physician's conclusion that J.D. had at least some limitation in acquiring and using information, that J.D. had no such limitation because she had improved -- because she met some of her own personal treatment goals and was "bright, alert, and exploratory" (R. 24). Again cherry-picking, the ALJ spoke of her ability to "identify three body parts, imitate three animal sounds, and name[ ] other familiar objects" (id.). That improperly and selectively quoted the record without any mention of any of the evidence suggesting material developmental delays.

Similarly, the ALJ concluded that J.D. had no problem attending to and completing tasks, despite J.D.'s well-documented behavioral problems, because in his opinion "being active and exploratory is not necessarily age inappropriate" (R. 25). That is an entirely subjective conclusion that contradicts the medical observations in the record that identified J.D.'s abnormal activity levels and her difficulty in focusing (as mentioned earlier, her treating physician even noted that she might have ADHD in the future).[12] If the ALJ found those medical findings troublesome,[13] he should have summoned an expert (Blakes, 331 F.3d at 570). And what has been said here only further compounds the non-harmless errors already discussed at length.

---

[12] In this respect the case is on all fours with Giles ex rel. Giles v. Astrue, 483 F.3d 483, 488 (7th Cir. 2007), where the Court of Appeals found that the ALJ's opinion was not supported by substantial evidence because the ALJ failed to explain how findings that the claimant had difficulty concentrating were "insufficient" to amount to "a marked limitation."

[13] This Court should not be misunderstood as approving such a mindset -- it may well be that another ALJ on remand, if the Commissioner elects that course (more on that subject in the
(continued)

Although that suffices to support Wilson's "playing doctor" criticism, in the interest of completeness this opinion turns to Wilson's second argument -- the one that seeks to invoke SSR 96-6P. That regulation provides that "[w]hen additional medical evidence is received," an ALJ must obtain an updated medical opinion on medical equivalence if "<u>in the opinion of the administrative law judge</u>" that added evidence "may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments" (emphasis added). By its terms the SSR does not require the ALJ to obtain an updated opinion -- instead it is discretionary in nature (<u>Buckhanon ex rel. J.H. v. Astrue</u>, 368 F. App'x 674, 679 (7th Cir. 2010)).

## Conclusion

It is hardly necessary to repeat the compelling reasons that cry out for a remand of this case to the Social Security Administration for further proceedings, and this Court so orders. Instead a few words are worth adding as to the case's future there.

This Court is of course well aware that the decision as to the handling of a case on remand is to be made by the Commissioner and not by the Article III judge or judges who conducted a review of the initial decision -- and this Court has always respected that principle. That said, however, this Court would consider itself remiss if failed to say that the discussion that has gone before appears to call for a fresh pair of eyes on remand. In comparable situations our Court of Appeals has found it appropriate to urge a reassignment on remand on a number of

---

(footnote continued)
<u>Conclusion</u> section), may find that the present findings alone call for an affirmative ruling as to J.D.'s disability.

- 16 -

occasions (see, e.g., Terry v. Astrue, 580 F.3d 471, 478 (7th Cir.2009) (per curiam) and cases cited there), and this Court does the same here.

_____
Milton I. Shadur
Senior United States District Judge

Date: September 29, 2014